KIM C. FRETER, MO Bar #47777
Federal Defender (by Appointment)
650 Missouri Avenue, Ste G10A
East. St. Louis, IL 62201
kim_freter@fd.org
Telephone: 618-482-9050

TIMOTHY E .WARRINER, CA Bar #166128
Law Office of Tim Warriner
455 Capitol Mall, Ste. 802
Sacramento, CA 95814
tew@warrinerlaw.com
Telephone: 916-443-7141

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>MARTIN LEIVA LEIVA (1),<br><br>Defendant. | Case № 1:22-cr-00232-BLW<br><br>Motion for Constitutionally Feasible Trial<br>Trial Date: July 6, 2026<br>Status Conference: January 6, 2026 |

## DEFENDANT MARTÍN LEIVA LEIVA'S MOTION FOR CONSTITUTIONALLY FEASIBLE TRIAL DATE

COMES NOW, Defendant, Mr. Martín Leiva Leiva, by and through counsel, pursuant to the Fifth, Sixth, and Eighth Amendments to the United States Constitution and 18 U.S.C. § 3005 and moves this Court to enter its Order setting a constitutionally feasible trial date in the summer of 2028. That is an average amount of time to prepare a case of this size and complexity for trial under the Federal Death Penalty Act, the Fifth Amendment's Due Process Clause, the Sixth Amendment's Counsel Clause, and the Eighth Amendment's Cruel and Unusual Punishment Clause.

Two years' time from the Government's Death Notice also is less time than it took the Government to bring this indictment in the first place *and* less time than it took the Government to file its Death Notice after it brought the indictment.



Case Timeline (2022 - 2025)

## I. This Court Should Set a Trial Date Consistent with Other Similarly Situated Cases

A capital trial is unlike a non-capital trial. From the point of view of the Government, the inception of a capital case requires obtaining an indictment that includes the elements of death-eligible capital murder codified in 18 U.S.C. §§ 3591(a) and (b). From the point of view of the Court, a capital indictment requires the appointment of specially trained and qualified defense counsel, planning for a more involved and protracted period for pretrial motions, preparing for weeks of jury selection, and navigating five decades of Supreme Court jurisprudence unique to capital cases. From the point of view of defense counsel, appointment to a capital case brings with it a slew of responsibilities that apply in no other context. Those responsibilities are described, justified, and explained in the American Bar Association's *Guidelines for the Appointment and Performance of Counsel in Death*

*Penalty Cases.*[1]

The *Guidelines* explain that defense counsel's earliest and ongoing investigative action plan "should seek a theory [of defense] that will be effective in connection with both guilt and penalty and should seek to minimize any inconsistencies." *Guideline 10.7.* Of course, that is impossible until the Government serves notice of its intention to seek the death penalty and its grounds for doing so. For this reason, trial dates are often selected for a time following the filing of the Government's Death Notice.

Mr. Leiva Leiva's request for a trial date at least 28 months from the Government's Death Notice is consistent with the average time allotted in other capital cases. Mr. Leiva Leiva again provides attached hereto as an Exhibit "Declaration of Matthew Reubenstein Regarding Preparation Time In Cases Authorized for the Death Penalty" that documents that the **"average time between the authorization of a capital prosecution and the start of trial is 28 months."**

## II.    This Court Should Set a Trial Date Commensurate with the Size and Complexity of this Case

The Court has indicated that it desires to set a firm trial date now rather than waiting for the Government to produce materials or for Mr. Leiva Leiva to more fully investigate the evidence. While Mr. Leiva Leiva has proposed a pretrial

---

[1] ABA Guidelines for Capital Representation
https://www.americanbar.org/groups/committees/death_penalty_representation/resources/aba_guidelines/2003-guidelines/

period within the national average for federal cases, this is not an average case.

- This case involves a defendant who has 45 years of life with no prior convictions who needs a competent, complex mitigation investigation.



- This case involves a defendant who was born in very rural El Salvador during a bloody civil war funded by the Government that now seeks to execute him.

- This case involves an exclusively Spanish speaking defendant who is illiterate.

- This case involves a defendant who spent years of his life in a refugee camp in Honduras.



*Refugiados y refugiadas llegando a Mesa Grande, abril de 1982*

- This case involves investigation in modern day El Salvador where travel is dangerous and limited.



- This case involves investigation in El Salvador wherein the government persists in its historical violence and imprisonment of persons it determines to be a hindrance to its authority.



*Arrest of auto repair mechanic for failure to carry an ID card, San Salvador, 1979-83*
*© John Hoagland Collection of the International Center of Photography*



*Environmental lawyer and human rights defender Alejandro Henriquez, along with Pastor José Angel Pérez, a leader of a rural farming community, were released after spending seven months in prison for taking part in a peaceful protest in El Salvador. The demonstration called on president Nayib Bukele to halt the eviction of more than 300 families from the El Bosque agricultural cooperative.*

- This case was well-aged before the Government brought it and includes five years of time elapsed between the last charged murder and Mr. Leiva Leiva's arrest.

- This case involves complex death scenarios with six named victims from 2016-2018. Mr. Leiva Leiva's counsel must investigate each of these six charged murders.

- This case involves multiple, historical crime scenes and statements related to both charged and uncharged crimes and acts of violence allegedly committed by this Defendant and each of the Government's cooperating witnesses.

- This case likely involves at least 10 Government informants each of whom must be thoroughly and separately investigated by the defense.

- This case involves thousands of hours of recorded calls in a specific Spanish dialect.

- This case relies on Spanish speaking conspirator statements, most of which remain undisclosed and untranslated.

### III. The Defense has Worked Diligently but Cannot Fully Prepare in Less than 28 Months

Counsel is under a duty to thoroughly investigate both phases of trial and all potentially available evidence related to both guilt and penalty. Guideline 10.2, *2023 ABA Guidelines*, 31 Hofstra L. Rev. 913, 105 (2003). "[C]ounsel must know what mitigating evidence there is, know what evidence may be used to rebut it, and make reasonable decisions about what mitigating evidence to use. Penalty phase investigation and preparation therefore are fundamental to effective advocacy in capital cases." Gary Goodpaster, *The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases*, 58 N.Y.U L. Rev. 299, 320 (1983). Counsel has undertaken tasks consistent with their duty to investigate Mr. Leiva Leiva's life history, emotional and psychological make-up as well as the substantive case and possible defenses.

However, mitigation investigation requires more than gathering records. It requires "an inquiry into the client's childhood, upbringing, education, relationships, friendships, formative and traumatic experiences, personal psychology and present feelings." Declaration of Susan Garvey, attached hereto, quoting Goodpaster, supra, at 320. Mr. Leiva Leiva must conduct interviews with witnesses under difficult circumstances after developing trust and rapport. Witnesses, generally, are unlikely or unwilling to share information they deem harmful or traumatic in a short phone conversation. See Declaration of Susan Garvey, attached hereto, Pages 16-19. In Mr. Leiva Leiva's case, witnesses are understandably wary of court appointed lawyers and do not even have regular access to telephone.

These witnesses must be contacted in-person after great travel in a dangerous and unstable environment. Mr. Leiva Leiva has undertaken actions to contact and investigate various witnesses. However, counsels' work remains incomplete and underdeveloped. Mr. Leiva Leiva must have more than four-months time in which to conduct interviews and investigation inside El Salvador in order to ensure effective assistance of counsel.

Investigation into Mr. Leiva Leiva's life history and background, particularly before the age of 18, must occur in order to prepare appropriate consultation regarding his mental health and any intellectual disability he may have. "Because a client who suffers from intellectual disability cannot be subjected to the death penalty, determining whether a client meets the diagnostic criteria is a facet of every capital case." See Declaration of Susan Garvey, Page 20. Retained mental health experts must have more than a couple of hours of visiting or testing in order to formulate an opinion. Instead, a qualified mental health professional must obtain and review "as much information as possible regarding a client's social and medical history to determine what genetic, organic, environmental, and other factors may have played a role in the client's development." Declaration of Susan Garvey, Page 20 citing H. Kaplan & B. Sadock, *Comprehensive Textbook of Psychiatry,* at 837 (4th ed, 1985).

Due to Mr. Leiva Leiva's international and rural upbringing, information regarding his life and social history will logically be developed from more than official records. Although Mr. Leiva Leiva has undertaken efforts to obtain this information, significant additional time is needed. Mr. Leiva Leiva's efforts are

more involved and complicated due to the lack of Spanish speaking mental health providers who are familiar with various testing instruments as correlated to native Spanish speakers from Central America who do not read.

Counsel's efforts to investigate and prepare Mr. Leiva Leiva's case have been further hindered by the US Government. Since the August 7, 2025 Death Notice, and despite the Government shutdown, Mr. Leiva Leiva has needed to file numerous substantive Motions and Replies, including motions requesting discovery, severance, and dismissal. Many of these pleadings were required only because of the Government's continued refusal to provide materials or agree to basic defense proposals (e.g. severance). The Government's posturing has diverted Mr. Leiva Leiva's efforts from investigation and preparation to briefing. As just one example, the Government surely knew well before briefing occurred on severance that it would be dismissing 4 codefendants from the case. Even if the Government was uncertain about the timing of its dismissals, it still could have consented to severance as is routinely done in other modern cases:

> On June 6, 2025, the Government filed its Notice of Intent to Seek the Death Penalty against Defendant Dajahn McBean. (Docket No. 119.) At the last conference on May 20, 2025, counsel for McBean indicated that, should the Government pursue the death penalty, he would likely seek an adjournment of the July 28, 2025 trial date. The Government does not oppose a request by McBean to sever his case from the remaining three defendants in order to allow him additional time to file motions related to the death penalty and to prepare for a potential capital trial.

The Government's course of conduct has diverted Mr. Leiva Leiva's efforts from his own investigation and can be remedied by a trial date that allows sufficient time for Mr. Leiva Leiva to earnestly continue his efforts.

## IV.    Ineffective Assistance of Counsel

Mr. Leiva Leiva's counsels' required scope of investigation must encompass Mr. Leiva Leiva's entire forty-five years of life, including that in El Salvador and the refugee camp in Honduras. Counsel must "construct a persuasive narrative in support of the case for life, rather than simply present a catalog of seemingly unrelated mitigation factors." Hon. Mark W. Bennett, *Sudden Death: A Federal Trial Judge's Reflections on the ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases*, 42 Hofstra L. Rev, 391, 400 (2013). When attorneys fail to investigate penalty phase, habeas petitions for ineffective assistance of counsel include these type of claims:

> "Counsel's unprofessional and unreasonable failure to obtain, investigate, synthesize and present available, powerful, inherently mitigating evidence on behalf of their client is inexcusable."

> "Although defense attorneys presented ten witnesses at penalty phase, lawyer's ineffective investigation and presentation resulted in 'hollow shell' of mitigation, omitting 'particularized circumstances of [petitioner's] past and of his actions on the day of the crime that would have allowed [jurors] fairly to balance the seriousness of his transgressions with the conditions of his life."

> "Trial counsel ineffective for failing to present evidence that petitioner was raised in abusive home and was himself beaten as a child; that at the age of 12 or 13 he ran away from home and was raped; that he grew up in an impoverished neighborhood with frequent street violence; and that he had an I.Q. of 83; state supreme court's view of 'attorney's penalty phase actions...[as] part of a sound trial strategy' was rejected because 'there was no justifiable reason to prevent the jury from learning about Simmons's [mitigating] childhood experiences."

"[D]eath penalty cases have become so specialized that defense counsel have duties and functions definably different from those of counsel in ordinary criminal cases." *American Bar Association, Guideline for the Appointment and Performance of Defense Counsel in Death Penalty Cases*, Guideline 1.1., Comm., 31 Hofstra L. Rev. 913, 923 (2003)("ABA Guidelines").

> The quality of counsel's 'guiding hand' in modern capital cases is crucial to ensuring a reliable determination of guilty and the imposition of an appropriate sentence. Today, it is universally accepted that the responsibilities of defense counsel in death penalty cases are uniquely demanding, both in the knowledge that counsel must possess and in the skills he or she must master. At every stage of a capital case, counsel must be aware of specialized and frequently changing legal principles, scientific developments, and psychological concerns. Counsel must be able to develop and implement advocacy strategies applying existing rules in the pressure-filled environment of high-stakes, complex litigation, as well as anticipate changes in the law that might eventually result in the appellate reversal of an unfavorable judgment.

*2003 ABA Death Penalty Guidelines, Introduction Commentary*

The Sixth Amendment requires that Mr. Leiva Leiva's counsel have an affirmative duty to seek discovery of the Government's case, *Kimmelman v. Morrison*, 477 U.S. 365, 384-85 (1986), and to conduct an independent investigation of that case for areas of impeachment or outright negation. *Id.* at 385. If evidence helpful to Mr. Leiva Leiva is available through reasonable investigation, counsel must obtain and develop it. *(Terry) Williams v. Taylor*, 529 U.S. 362, 393 (2000); *Rompilla v. Beard*, 545 U.S. 374, 389 (2005). If expert analysis is required and available to develop the evidence, defense counsel must obtain that expert assistance and bring it to bear on the evidence after it has been evidence gathered. *Hinton v. Alabama*, 571 U.S. 263, 274 (2014); *Harrington v. Richter*, 562 U.S. 86,

106 (2011).

When the Supreme Court has "addressed directly the relevance standard applicable to mitigating evidence in capital cases . . . [the Court] spoke in the most expansive terms." *Tennard v. Dretke*, 542 U.S. 274, 284 (2004). It said, for example, that "virtually no limits are placed on the relevant mitigating evidence a capital defendant may introduce concerning his own circumstances." *Eddings v. Oklahoma*, 455 U.S. 104, 114 (1982). Information may be mitigating even if there is no explanatory or causal nexus between it and the charged offense. *Tennard*, 542 U.S. at 286-87; *Abdul-Kabir v. Quarterman*, 550 U.S. 233 (2007); *Smith v. Texas*, 543 U.S. 37, 44-45 (2004) (*per curiam*). For example, in *Skipper v. South Carolina*, 476 U.S. 1 (1986), the Court held that a capital sentencing jury must be permitted to hear and consider evidence of the defendant's positive adjustment to prison. Mr. Leiva Leiva had no compulsion to send investigators into the dangerous El Salvadorean environment until *after* the Government's August 7, 2025 Death Notice. Beginning in July 2021, then Attorney General Garland imposed a moratorium on federal executions and began review of the Department of Justice's policies regarding the death penalty.[2] Thereafter, the Department of Justice withdrew Death Notices in several authorized cases and ultimately only filed one new notice during President Biden's administration.[3]

---

[2] (https://www.justice.gov/archives/opa/pr/attorney-general-merrick-b-garland-imposes-moratorium-federal-executions-orders-review#:~:text=Breadcrumb,Prisons%2C%20using%20the%20drug%20pentobarbital

[3] US v. Gendron, 1:22CR00109 LJV https://thehill.com/homenews/administration/564338-biden-administration-not-seeking-death-penalty-in-7-cases/ and https://abcnews.go.com/US/justice-department-pursue-death-penalty-buffalo-supermarket-shooter/story?id=106322955 and https://abcnews.go.com/US/justice-department-pursue-death-penalty-buffalo-supermarket-shooter/story?id=106322955

It was publicly known during President Biden's administration that the Department of Justice would seek the death penalty only in rare cases (*Gendron*) and would not authorize death even in RICO related murder cases with multiple homicides. See e.g. *US v. Reyes-Castillo*, DNV 2:19CR00103 JDM-VCF (ten RICO related homicides), *US v. Hernandez*, et al, CDCA 2:19CR00117 ODW (twelve RICO related homicides), *US v. Alfaro*, et al EDNY 2:20CR0251 JFB (seven RICO related homicides), and *US v. Amaya-Sanchez*, et al EDNY 2:16CR403 JFB (eighteen RICO related homicides). Even in this case, the Government declined to seek the death penalty against seven co-defendants in June 2024. (Docs 166, 165).

The Government communicated in the Summer of 2024 that it would make its submission to the Capital Review Committee prior to the 2024 Presidential Election. The Government made assurances to counsel that it was not intentionally or strategically delaying its submission. Mr. Leiva Leiva relied upon the Government's representation and had every reason to believe that a Biden No-Seek would be forthcoming. The facts of the case supported a No-Seek: the Government filed No Seeks against the charged defendants who it alleged were the actual perpetrators of the murders. Further, the Government's case against Mr. Leiva Leiva is almost exclusively based upon statements of cooperators with histories of misleading and lying to the Government. For example, in February 2025 with the filing of the Second Superseding Indictment the Government attempted to cure the lies of its unreliable cooperator by removing Mr. Urias-Torress from substantive murder Count 3. Mr. Leiva Leiva had every reason to believe that the Government would report to the Capital Review Committee that its primary witnesses were

becoming more unreliable over time such that it needed to dismiss counts. Cases based primarily upon unreliable narrators are generally not ones in which the Government seeks execution.

Continuing into the Spring of 2025, Mr. Leiva Leiva still had every reason to believe that a No-Seek would be forthcoming. Counsel became aware only after the Government's surprise filing of the Third Superseding Indictment that the Government was positioning its case for a Death Notice. Mr. Leiva Leiva must not be penalized for counsel's failure to investigate in El Salvador and Honduras under dangerous circumstances *before* the Government filed its Death Notice in August 2025.

## V.    Investigation in El Salvador is Uniquely Difficult



Mr. Leiva Leiva's mitigation specialist took the above photo in the fall of 2025. This and at least one other similarly outfitted vehicle made continued travel

for defense staff dangerous. Mr. Levia Leiva's defense team were forced to turn back from their anticipated destination and investigation was terminated for the day. Mr. Leiva Leiva's defense team is right to exercise caution. The Salvadorean armed forces have a long history of threats and violence toward civilians. The U.S. State Department continues to warn visitors that El Salvador is operating under a "State of Exception" wherein regular judicial process is suspended and any person alleged of belonging to or associating with gangs can be detained and held. See Declaration of Sue Garvey, attached hereto as Exhibit, and https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/el-salvador-travel-advisory.html.

Travel in El Salvador is limited at night and Mr. Leiva Leiva's village where his witnesses are located is several hours away from the capital where appropriate lodging may be found. Day time travel is arduous and can be undermined by Government soldiers (see above). Under these circumstances, Mr. Leiva Leiva must have more than a handful of months to work through these obstacles.

Consistent with professional standards, counsel has identified in-country support to assist with transportation and security. See Declaration of Sue Garvey, Page, 4. However, it is "antithetical to counsel's duties to the client and duty to conduct a thorough defense investigation [as described below] to reach out to law enforcement, or para-military organizations for assistance. They are inappropriate resources." *Id*. This axiom is particularly true inside El Salvador where the local government is working hand-in-hand with the U.S. Government to detain and "disappear" any individual associated with MS-13. Interference by the U.S.

Government "on Mr. Leiva Leiva's behalf" is likely to identify his family and other witnesses as persons to be targeted, detained, and possibly executed by the Salvadorean Government. This is a situation in which U.S. Government intervention and interference could be deadly for persons involved and should not be undertaken.

VI.    Conclusion

Mr. Leiva Leiva's request for a Constitutionally feasible trial date in the summer of 2028 is within national standards for federal death penalty cases, generally, and is appropriate under the unique facts and circumstances of this case.

WHERREFOR, for all of the foregoing reasons, Mr. Leiva Leiva requests this Court to set a constitutionally feasible trial date in the summer of 2028 and for any additional relief that it deems just and proper.

Dated: December 22, 2025

Respectfully Submitted,

/s/    *Kim C. Freter*

KIM C. FRETER

Attorney for Defendant Martin Leiva Leiva

AND

*U.S. v. Martin Leiva Leiva*                    -16-                    Martin Leiva Leiva Continue Trial Date

/s/   *Timothy E. Warriner*  (with

permission)

TIMOTHY E. WARRINER

Attorney for Defendant Martin Leiva Leiva