ERIC GRANT
United States Attorney
JUSTIN J. GILIO
ROBERT L. VENEMAN-HUGHES
Assistant United States Attorney
2500 Tulare Street, Suite 4401
Fresno, CA 93721
Telephone: (559) 497-4000
Facsimile: (559) 497-4099

Attorneys for Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 1:22-CR-00232-BLW-BAM |
| Plaintiff, | GOVERNMENT'S RESPONSE IN OPPOSITION TO LEIVA-LEIVA'S MOTION TO SUPPRESS STATEMENTS |
| v. | |
| MARTIN LEIVA-LEIVA, aka "DARK," aka "DAR", | DATE: May 8, 2026 |
| Defendant. | COURT: Hon. B. Lynn Winmill |

**GOVERNMENT'S RESPONSE IN OPPOSITION TO LEIVA-LEIVA'S MOTION TO SUPPRESS STATEMENTS**

OPPOSITION TO LEIVA-
LEIVA'S MOTION TO
SUPPRESS STATEMENTS

**TABLE OF CONTENTS**

I.      INTRODUCTION ...................................................................................................1

II.     STATEMENT OF FACTS ......................................................................................2

    A.      In June of 2020, two officers spoke with Leiva-Leiva in his front yard............................2

    B.      In June of 2023 Leiva-Leiva was arrested, transported to the Sheriff's Office, and answered initial biographical questions. ...................................................................4

    C.      Leiva-Leiva waived his *Miranda* rights...........................................................................5

    D.      Leiva-Leiva spoke with Detectives Antunez and Iniguez for about an hour and a half, with two breaks totaling about 30 minutes, and was provided food.........................6

    E.      After a third break, Leiva-Leiva persisted in his denials during a more confrontational 40-minute interview by Special Agent Demmon. ...................................7

III.    LEGAL ANALYSIS................................................................................................7

    A.      The Court should deny Leiva-Leiva's motion to suppress the statements he made in June of 2020 because he was not in custody and therefore had no right to *Miranda* warnings. ...................................................................................7

    B.      This Court should deny Leiva-Leiva's motion to suppress his 2023 interview statements.........................................................................................................12

        1.      The Pre-*Miranda* questions and answers fell under the "Booking Exception."...........................................................................................12

        2.      Leiva-Leiva knowingly, intelligently, and voluntarily waived his *Miranda* rights. .........................................................................................15

        3.      Leiva-Leiva voluntarily made his statements during the 2023 interview. .............................................................................................17

            a.      Leiva-Leiva's selective admissions confirm a functioning, not overborne, will. ............................................................................18

            b.      Leiva-Leiva's conditions of confinement fall well within constitutional limits.........................................................................18

            c.      Special Agent Demmon's tactics were not psychologically overbearing. ..................................................................................20

            d.      Leiva-Leiva lacked the vulnerabilities that typically support coercion claims. ............................................................................21

            e.      Failure to notify the Defendant of his consular rights is not a basis for suppression. .....................................................................21

IV.     CONCLUSION.....................................................................................................22

OPPOSITION TO LEIVA-
LEIVA'S MOTION TO
SUPPRESS STATEMENTS

**TABLE OF AUTHORITIES**

Page(s)

Cases

*Amaya-Ruiz v. Stewart*,
121 F.3d ................................................................................................................ 19, 20

*Ashcraft v. Tennessee*,
322 U.S. 143 (1944)....................................................................................................... 19

*Beckwith v. United States*,
425 U.S. 341 (1976)......................................................................................................... 9

*Blackburn v. Alabama*,
361 U.S. 199 (1960)................................................................................................... 17, 18

*California v. Beheler*,
463 U.S. 1121 (1983).................................................................................................. 8, 10

*Colorado v. Connelly*,
479 U.S. 157 (1986)....................................................................................................... 15

*Cunningham v. Perez,*
345 F.3d 802 (9th Cir. 2003) ......................................................................................... 18

*Davis v. United States*,
327 F.2d 301 (9th Cir. 1964) ........................................................................................... 9

*Derrick v. Peterson*,
924 F.2d 813 (9th Cir. 1990) .................................................................................... 15, 19

*Doody v. Schriro*,
596 F.3d 620 (9th Cir. 2010) ......................................................................................... 17

*Frazier v. Cupp*,
394 U.S. 731 (1969)....................................................................................................... 20

*Miranda v. Arizona*,
384 U.S. 436 (1966).................................................................................................... 8, 15

*Oregon v. Mathiason*,
429 U.S. 492 (1977)....................................................................................................... 10

*Ortiz v. Uribe*,
671 F.3d 863 (9th Cir. 2011) ......................................................................................... 20

*Pennsylvania v. Muniz*,
   496 U.S. 582 (1990) ............................................................................................................. 12

*Ramirez-Marentes v. Ryan*,
   2010 WL 2902524 (C.D. Cal. June 18, 2010) ..................................................................... 21

*Rodriguez v. McDonald*,
   872 F.3d 908 (9th Cir. 2017) ............................................................................................... 15

*Sanchez-Llamas v. Oregon*,
   548 U.S. 331 (2006) ............................................................................................................. 21

*Schneckloth v. Bustamonte*,
   412 U.S. 218 (1973) ............................................................................................................. 17

*Stansbury v. California*,
   511 U.S. 318 (1994) ............................................................................................................... 8

*Taylor v. Maddox*,
   366 F.3d 992 (9th Cir. 2004) ............................................................................................... 21

*United States v. Barnes*,
   713 F.3d 1200 (9th Cir. 2013) ............................................................................................. 11

*United States v. Bassignani*,
   575 F.3d 879 (9th Cir. 2009) ............................................................................................ 9, 10

*United States v. Bautista-Avila*,
   6 F.3d 1360 (9th Cir. 1993) ................................................................................................. 20

*United States v. Beraun-Panez*,
   812 F.2d 578 (9th Cir. 1987) ........................................................................................... 10, 11

*United States v. Binder*,
   769 F.2d 595 (9th Cir. 1985) ............................................................................................... 15

*United States v. Booth*,
   669 F.2d 1231 (9th Cir. 1981) ............................................................................................. 13

*United States v. Brobst*,
   558 F.3d 982 (9th Cir. 2009) .......................................................................................... 10, 11

*United States v. Burns*,
   37 F.3d 276 (7th Cir. 1994) ................................................................................................... 9

*United States v. Cardenas*,
   410 F.3d 287 (5th Cir. 2005) .......................................................................................... 17, 19

*United States v. Craighead*,
   539 F.3d 1073 (9th Cir. 2008) .......................................................................................... 8, 11

*United States v. Crawford,*
  372 F.3d 1048 (9th Cir. 2004) ................................................................................................ 10

*United States v. Crespo de Llano,*
  838 F.2d 1006 (9th Cir. 1987) ................................................................................................ 21

*United States v. Crews,*
  502 F.3d 1130 (9th Cir. 2007) ........................................................................................... 15, 16

*United States v. Foster,*
  227 F.3d 1096 (9th Cir. 2000) ................................................................................................ 13

*United States v. Garibay,*
  143 F.3d 534 (9th Cir. 1998) .................................................................................................. 15

*United States v. George,*
  987 F.2d 1428 (9th Cir. 1993) ................................................................................................ 17

*United States v. Gonzalez-Sandoval,*
  894 F.2d 1043 (9th Cir. 1990) ................................................................................................ 12

*United States v. Gotchis,*
  803 F.2d 74 (2d Cir. 1986).................................................................................................... 14

*United States v. Gregory,*
  891 F.2d 732 (9th Cir. 1989) ............................................................................................... 9, 10

*United States v. Haswood,*
  350 F.3d 1024 (9th Cir. 2003) ........................................................................................... 18, 20

*United States v. Hayden,*
  260 F.3d 1062 (9th Cir. 2001) ............................................................................................. 8, 11

*United States v. Hernandez,*
  No. CR 11–00634–PHX–FJM, 2012 WL 161208 (D. Ariz. Jan. 19, 2012)........................................ 14

*United States v. Kim,*
  292 F.3d 969 (9th Cir. 2002) ................................................................................... 8, 10, 11, 12

*United States v. Knope,*
  655 F.3d 647 (7th Cir. 2011) .................................................................................................. 14

*United States v. Lin,*
  No. CR–01–20071 RMW (PVT), 2007 WL 405029 (N.D. Cal. Feb. 2, 2007).................................. 14

*United States v. Lombera–Camorlinga,*
  206 F.3d 882 (9th Cir. 2000) .................................................................................................. 21

*United States v. Martinez,*
  602 F. App'x 658 (9th Cir. 2015) ............................................................................................ 11

*United States v. Mata-Abundiz*,
 717 F.2d 1277 (9th Cir. 1983) ............................................................................................ 12, 13, 14

*United States v. Miller*,
 984 F.2d 1028 (9th Cir. 1993) ............................................................................................ 18

*United States v. Moreno-Flores*,
 33 F.3d 1164 (9th Cir. 1994) ............................................................................................ 20

*United States v. Norris*,
 428 F.3d 907 (9th Cir. 2005) ............................................................................................ 10

*United States v. Orso*,
 266 F.3d 1030 (9th Cir. 2001) ............................................................................................ 19

*United States v. Perea-Rey*,
 680 F.3d 1179 (9th Cir. 2012) ............................................................................................ 9

*United States v. Preston*,
 751 F.3d 1008 (9th Cir. 2014) ............................................................................................ 21

*United States v. Ramos*,
 65 F.4th 427 (9th Cir. 2023) ............................................................................................ 18

*United States v. Salgado*,
 292 F.3d 1169 (9th Cir. 2002) ............................................................................................ 13

*United States v. Swanson*,
 341 F.3d 524 (6th Cir. 2003) ............................................................................................ 8

*United States v. Tingle*,
 658 F.2d 1332 (9th Cir. 1981) ............................................................................................ 20

*United States v. Tryals*,
 525 F. App'x 554 (9th Cir. 2013) ............................................................................................ 12

*United States v. Wauneka*,
 770 F.2d 1434 (9th Cir. 1985) ............................................................................................ 10, 11

*United States v. Williams*,
 435 F.3d 1148 (9th Cir. 2006) ............................................................................................ 17

*United States v. Zapien*,
 861 F.3d 971 (9th Cir. 2017) ............................................................................................ 12, 13

OPPOSITION TO LEIVA-
LEIVA'S MOTION TO
SUPPRESS STATEMENTS

ERIC GRANT
United States Attorney
JUSTIN J. GILIO
Assistant United States Attorney
2500 Tulare Street, Suite 4401
Fresno, CA 93721
Telephone: (559) 497-4000
Facsimile: (559) 497-4099

Attorneys for Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 1:22-CR-00232-BLW-BAM |
| Plaintiff, | GOVERNMENT'S RESPONSE IN OPPOSITION TO LEIVA-LEIVA'S MOTION TO SUPPRESS STATEMENTS |
| v. | |
| MARTIN LEIVA-LEIVA, AKA "DARK," AKA "DAR," | DATE: May 8, 2026 |
| Defendants. | COURT: Hon. Hon. B. Lynn Winmill |

## I.     INTRODUCTION

Defendant Leiva-Leiva moves to suppress statements that he made during two interviews. He argues the first interview was an unwarned, custodial interrogation. As for the second, he argues the interview began with improper pre-*Miranda* questions, and that all his answers were involuntary because of the conditions of his transport, detention, and questioning. His motion should be denied.

No *Miranda* warnings were required before the June 2020 interview. He was not in custody during a consensual conversation with two officers in front of his residence.

The biographical questions and answers at the beginning of the 2023 interview fell within the exception from *Miranda* for routine booking questions.

And none of the circumstances of his detention during the 2023 interview overbore his will. The record instead shows a suspect who understood his rights, was treated appropriately, exercised judgment, and chose what he wanted to say. Thus, this Court should deny his motion.

OPPOSITION TO LEIVA-LEIVA'S
MOTION TO SUPPRESS STATEMENTS

1

## II.    STATEMENT OF FACTS

### A.    In June of 2020, two officers spoke with Leiva-Leiva in his front yard.

During the daytime on June 18, 2020, as part of an ongoing investigation into RICO violations, two officers spoke with Leiva-Leiva in front of his residence.[1]  Government's Exhibit 1, 2026 Report of Interview of Special Agent Demmon; Government's Exhibit 3, 2020 Interview Report.  The agents were not there to execute a warrant.  They were there to speak with Leiva-Leiva, ask him for consent to obtain his DNA, and request permission to search his property.  Government's Exhibit 1.

Before the interview, four law enforcement officers were surveilling the residence to try to contact Leiva-Leiva.  *Id.*  The property consisted of three structures (from left to right below), (1) a house with a brown roof, (2) a grey two-story back-building, and (3) a white detached garage.  *See id.*  The entire property was fenced; to reach the front door to either house, a visitor first would need to enter through a gate.



Google Map Photograph of Leiva-Leiva's residence – street view dated 2019 (attachment to Government's Exhibit 1)

On the day of the interview, the agents saw Leiva-Leiva in front of the detached garage, i.e., the white building on the far right.  Government's Exhibit 2, 2026 Report of Interview of Task Force Officer Ryan Yetter.  At least three of the four[2] officers exited their cars and approached.  *Id.*  FBI

---

[1] Special Agent Demmon does not specifically recall but believes he may have been wearing a department-issued vest with FBI written on it.

[2] The officers are uncertain on whether the fourth officer ever exited his car, but even if he did, he did not speak with Leiva-Leiva.

OPPOSITION TO LEIVA-LEIVA'S
MOTION TO SUPPRESS STATEMENTS

2

Special Agent Demmon and Det. Leon, both Spanish speakers, greeted Leiva-Leiva and asked if he had time to speak with them. Government's Exhibits 1, 2; Government's Exhibit 10, Transcript of 2020 Interview. The third officer, California Highway Patrol Officer Ryan Yetter, who did not speak Spanish, stood back and did not participate in the interview. Government's Exhibit 2.

The two officers spoke to Leiva-Leiva in Spanish for about 40 minutes; their interaction was conversational. Government's Exhibit 9, Recording of 2020 Interview; Government's Exhibit 10.[3] Leiva-Leiva was never blocked from returning to his residence or leaving the property. Governments Exhibits 1, 2. He was not detained in any way, he was never placed in handcuffs, and the officers never touched him. *Id.* The officers were armed, but their weapons were concealed and never drawn. *Id.*

During the conversation, Leiva-Leiva and the officers discussed his family and housing situation as well as his employment. Government's Exhibit 10 at 1-7. Leiva-Leiva provided his cell phone number and used his phone to show the agents his Facebook account. *Id.* at 13. During the conversation, the officers explained that they had discovered wire transfers that Leiva-Leiva had made to recipients in El Salvador and Mendota. *Id.* at 15, 26-27. Demmon showed Leiva-Leiva a photograph of one of the recipients. *Id.* at 18. Leiva-Leiva explained how he was connected to the recipients and why he sent them money. *Id.*

Demmon asked Leiva-Levia whether he was part of MS-13 and inquired about the moniker, "Dark." *Id.* at 27-29. Leiva-Leiva denied associating with MS-13 and denied knowing that others called him "Dark." *Id.* Demmon asked Leiva-Leiva if he had any tattoos. *Id.* at 17-18. Leiva-Leiva lifted his shirt up to show he did not. *Id.* The officers asked whether Leiva-Leiva would provide his DNA with a buccal swab; he agreed and provided it. *Id.* at 29-30. Demmon then asked whether Leiva-Leiva would allow the officers to search his house, but Leiva-Leiva declined, explaining that the officers would need a warrant. *Id.* at 33-35. The officers discussed potentially meeting up with Leiva-Leiva again. *Id.* at 40-42. Then they left. *Id.* at 44. During the brief conversation, Leiva-Leiva never asked the officers to leave or indicated any intention to leave. *Id.*

---

[3] The government produced this recording in Discovery (MAL_00000001). After reviewing Leiva-Leiva's motion to suppress, the government had this recording translated by a Spanish language translator. This is an unofficial transcript; the government reserves the right to produce an official transcript at a later time.

OPPOSITION TO LEIVA-LEIVA'S
MOTION TO SUPPRESS STATEMENTS

**B.**   **In June of 2023 Leiva-Leiva was arrested, transported to the Sheriff's Office, and answered initial biographical questions.**

Three years later, on June 8, 2023, law enforcement officers arrested Leiva-Leiva pursuant to a federal warrant. Government's Exhibit 4, Transportation report. Following the arrest, officers transported him from the Bay Area to the Sheriff's Office station in Fresno, CA. *Id.* During the drive, he was provided water and remained in standard transport handcuffs. *Id.* He was handcuffed in the front of his body for comfort. Government's Exhibit 5, 2026 Follow-up Report on Transportation. About halfway through the drive, the transport officers escorted Leiva-Leiva to a restroom so he could relieve himself. Government's Exhibits 4, 5. Leiva-Leiva raised no issue of discomfort along the drive. *Id.*

At the Sheriff's station, Leiva-Leiva was uncuffed and placed in room that had a couch, a fan, a table, tissues, a trash can, and some paper and writing utensils. Government's Exhibit 5; Government's Exhibit 6, 2023 Interview Recording Part 1. He also had a water bottle with drinking water. *Id.* After about eight minutes in the room alone, Detectives Rich Antunez and Oscar Iniguez entered the room and began speaking with him. Government's Exhibit 6 at 7:50-13:13. Antunez and Iniguez were detectives with the Fresno County Sheriff's Office, the agency responsible for the operation of the Fresno County Jail,[4] the facility into which defendant Leiva-Leiva was eventually booked.

The detectives started the interview with a series of preliminary questions regarding Leiva-Leiva's identity, employment history, and family. The first questions included his name, date of birth, age, telephone number, and address. Government's Exhibit 8, Interview Transcript at 1-3. After those initial questions, the next set of questions related to Leiva-Leiva's employment, who he lived with, and whether he had any children. *Id.* at 3-7. The recording and the transcript show that those questions were conversational. So naturally, some of Leiva-Leiva's answers led to follow-up questions, for example questions about the size or location of his employer's company or how Leiva-Leiva chose his son's name. *Id. see* Government's Exhibit 6 at 7:50-13:13.

After getting through those biographical questions, Det. Antunez indicated that he was going

---

[4] *See* Fresno County Sheriff's Office website, Jail Division, available at https://www.fresnosheriff.org/jail.html (last visited on April 14, 2026).

OPPOSITION TO LEIVA-LEIVA'S
MOTION TO SUPPRESS STATEMENTS

4

turn to questions about the investigation but first explained he needed to read "the Miranda warning." Government's Exhibit 8 at 7-8. In an apparent effort to see whether Leiva-Leiva was familiar with *Miranda*, Det. Antunez asked whether Leiva-Leiva had ever been arrested, which led to a brief discussion (about four more questions and answers) in which Leiva-Leiva indicated he had a prior encounter with law enforcement for driving without a license. *Id.* at 8. After that brief aside, Det. Antunez turned to the *Miranda* warnings. *Id.*

### C.    Leiva-Leiva waived his *Miranda* rights.

Before reading the four *Miranda* warnings, Det. Antunez explained to Leiva-Leiva what he was about to do: "I'm going to read you your *Miranda* warning, okay?" *Id.*; Government's Exhibit 6 at 13:14. Leiva-Leiva indicated he understood what that meant: "Yes." *Id.* Det. Antunez further explained, "those are your rights." *Id.* And Leiva-Leiva affirmed his understanding again: "uh-huh." *Id.* In the video recording, he can be seen leaning in to pay close attention. *Id.* at 13:19-21. Det. Antunez then emphasized that Leiva-Leiva would need to indicate out loud whether he understood each one. Government's Exhibit 8 at 8. And Leiva-Leiva again indicated that he understood that: "uh-hum." *Id.* at 9. Det. Antunez emphasized that Leiva-Leiva needed to respond unambiguously so there would be no confusion. *Id.* Leiva-Leiva indicated he understood: "Yes." Det. Antunez emphasized the need for clarity one last time: "I want to be very direct and clear with you." *Id.* And Leiva-Leiva again affirmed: "Of course." *Id.* In the video, Leiva-Leiva is nodding, indicating his understanding. Government's Exhibit 6 at 13:30-33.

Det. Antunez began the *Miranda* warnings with "*So*, you have the right to remain quiet. Do you understand?" Government's Exhibit 8 at 9. Leiva-Leiva paused to think about the warning and then said, "To remain…" *Id.* Leiva-Leiva appeared to emphasize that his hesitation was coming from the fact that he had never been in this situation before: "I've never been in-in anything like that, I don't have any knowledge about what that." *Id.* So, Det. Antunez read the right again: "*So*, you have the right to remain quiet. Do you understand what that—what that means?" *Id.* Before answering, Leiva-Leiva confirmed the question: "You are telling me that I have the right to—to remain quiet, right?" *Id.* Det. Antunez affirmed: "Yes." *Id.* Leiva-Leiva responded with "Okay." *Id.* And Det. Antunez followed up to be sure: "*So*, you understand?" *Id.* And Leiva-Leiva affirmed: "Yes" followed by

OPPOSITION TO LEIVA-LEIVA'S
MOTION TO SUPPRESS STATEMENTS

5

further confirmation, "I understand that." *Id.* The video captures him nodding in agreement. Government's Exhibit 6 at 13:56-58. Det. Antunez then moved to the second, third, and fourth warnings. For each Det. Antunez read the warning and sought and received verbal confirmation that Leiva-Leiva understood the right. Government's Exhibit 8 at 9-10.

**D.   Leiva-Leiva spoke with Detectives Antunez and Iniguez for about an hour and a half, with two breaks totaling about 30 minutes, and was provided food.**

After Leiva-Leiva waived *Miranda*, the detectives interviewed him for about 30 minutes. Government's Exhibit 6 at 14:19-45:52. He was asked an array of questions related to the long-running investigation into MS-13 in Mendota. He consistently denied being a member of MS-13, knowing various MS-13 gang members, or being involved with any of their crimes. Government's Exhibit 8 at 10-48.

The detectives then gave Leiva-Leiva an 18-minute break. Government's Exhibit 6 at 45:52–1:03:25. Before leaving the room, Det. Antunez asked "Do you need more water, or are you okay for now?" Government's Exhibit 8 at 47; Government's Exhibit 6 at 45:52-55. Leiva-Leiva confirmed that he was fine and thanked Det. Antunez. Government's Exhibit 8 at 47.

After the first break (Government's Exhibit 6 at 45:52–1:03:25), the two detectives returned and continued the interview. Before starting again, however, they first read Leiva-Leiva a *Corley* warning and obtained his signature on a *Corley* waiver form (in Spanish). *Id.* at 1:03:25-1:07:19; Government's Exhibit 8 at 48-52. Then, they continued to interview Leiva-Leiva for another 40 minutes, before taking a second break. Government's Exhibit 6 at 1:07:19-1:47:35. During this portion of the interview, Leiva-Leiva persisted in his denials. The officers played recordings for Leiva-Leiva, and after he first denied that it was his voice on the recordings, he later admitted that he recognized his voice. Government's Exhibit 8 at 52-81.

At the end of this second portion of the interview, Det. Antunez asked again whether Leiva-Leiva wanted water "or anything else?" *Id.* at 81. And Leiva-Leiva declined. *Id.* At that point, Det. Iniguez suggested that Leiva-Leiva could lie down and rest if he wanted to. *Id.* Even though Leiva-Leiva had not mentioned being hungry, Det. Antunez offered food. *Id.* Leiva-Leiva remarked that he was hungry and accepted the offer for food. *Id.* at 81-82. When the officers left, Leiva-Leiva lay down

OPPOSITION TO LEIVA-LEIVA'S
MOTION TO SUPPRESS STATEMENTS

6

and rested for about 9 minutes.  Government's Exhibit 6 at 1:47:35-1:56:49.

After the second break, the officers returned with chips and a sandwich.  *Id.* at 1:56:35-49. While Leiva-Leiva ate, the officers spoke with him for about another 8 minutes.  *Id.* at 1:56:49–2:04:52. At the end of that portion of the interview, Det. Antunez shook Leiva-Leiva's hand, and Leiva-Leiva thanked the officers "for the sandwich and everything." *Id.* at 2:04:36–2:04:52; Government's Exhibit 8 at 90.

Leiva-Leiva was then given a longer break, over an hour.  Toward the end of that break, he urinated in a water bottle.  When the officers realized what he was doing, they entered the room and notified him that all he had to do was knock on the door and someone would have taken him to a bathroom.  *Id.* at 90-91.

### E.     After a third break, Leiva-Leiva persisted in his denials during a more confrontational 40-minute interview by Special Agent Demmon.

After the break, Special Agent Demmon and Det. Antunez entered the room to resume questioning.  Government's Exhibit 7, Interview Recording Part 2 at 1:20:59.  Demmon adopted a more vigorous and confrontational questioning style, which included sliding the table out of the way with his foot so he could sit face to face with Leiva-Leiva, raising his voice, and using blunt language ("You know you're screwed, right?").  Government's Exhibit 8 at 92.  Despite the change in tone, Leiva-Leiva remained resilient.  He was less conversational at times, but he generally answered the questions and remained steadfast in refusing to admit the underlying RICO allegations.  *Id.* at 92-112.  He consistently parried the agent's questions and denied guilt.  *E.g.*, *Id.* at 100 ("I-I'm telling you that I've haven't done the things that you think—what you've pointed out that I was doing."); (denying that he ordered any murders); (denying that he had a "rank" in MS-13).  When Demmon confronted him about the recording of his voice, Leiva-Leiva reaffirmed his earlier statement to Det. Antunez, again admitting that the voice on the recording was his own.  *Id.* at 98.

### III.     LEGAL ANALYSIS

### A.     The Court should deny Leiva-Leiva's motion to suppress the statements he made in June of 2020 because he was not in custody and therefore had no right to *Miranda* warnings.

The 2020 interview lacks the "indicia of arrest" required for *Miranda* to apply.

OPPOSITION TO LEIVA-LEIVA'S
MOTION TO SUPPRESS STATEMENTS

7

*Miranda* warnings are required only if a suspect is subject to custodial interrogation. *Miranda v. Arizona*, 384 U.S. 436, 478 (1966). A person has been taken into custody when he has either been arrested or "otherwise been deprived of his freedom by the authorities in any significant way." *Id.* at 444. This is an objective inquiry to determine "whether a reasonable person in those circumstances would 'have felt he or she was not at liberty to terminate the interrogation and leave.'" *United States v. Craighead*, 539 F.3d 1073, 1082 (9th Cir. 2008). Ultimately, the inquiry "is simply whether there [was] a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *Stansbury v. California*, 511 U.S. 318, 322 (1994) (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983)).

Courts look at the totality of the circumstances. *Beheler*, 463 U.S. at 1125. They take into account: "(1) the language used to summon the individual; (2) the extent to which the defendant is confronted with evidence of guilt; (3) the physical surroundings of the interrogation; (4) the duration of the detention; and (5) the degree of pressure applied to detain the individual." *United States v. Kim*, 292 F.3d 969, 974 (9th Cir. 2002) (*quoting United States v. Hayden*, 260 F.3d 1062, 1066 (9th Cir. 2001)).

Questioning in surroundings familiar to the defendant, such as a person's residence, is viewed with less scrutiny than a "coercive" or "hostile" setting, such as a police department or law enforcement office. *United States v. Swanson*, 341 F.3d 524, 528 (6th Cir. 2003). Interviews in familiar places like the home are less custodial in nature. *Craighead*, 539 F.3d at 1083 (noting that "courts have generally been much less likely to find that an interrogation in the suspect's home was custodial in nature"). This is because "[t]he element of compulsion that concerned the Court in *Miranda* is less likely to be present where the suspect is in familiar surroundings." *Id.*

For analyzing questioning inside the home, the appropriate inquiry is whether the circumstances in the home amounted to a "police-dominated atmosphere" amounting to custody (and thus requiring *Miranda* warnings). For this determination, courts look at four non-exhaustive factors: (1) the number of law enforcement personnel and whether they were armed; (2) whether the suspect was at any point restrained, either by physical force or by threats; (3) whether the suspect was isolated from others; and (4) whether the suspect was informed that he was free to leave or terminate the interview, and the context in which any such statements were made. *Craighead*, 539 F.3d at 1084. This test—determining

OPPOSITION TO LEIVA-LEIVA'S
MOTION TO SUPPRESS STATEMENTS

whether the atmosphere was dominated by police—is generally applied when officers interview a target inside a room in his home during the execution of a search warrant. But even in that more dominating and controlled circumstance, the suspect is often not in "custody." *See United States v. Burns*, 37 F.3d 276, 281 (7th Cir. 1994) ("in the usual case, a person detained during the execution of a search warrant is not 'in custody' for purposes of *Miranda"*).

A "knock and talk" at a suspect's residence—a conversation that occurs when officers seek to speak with a person outside of any other formal warrant process—is ordinarily consensual. "[T]here is no rule of private or public conduct which makes it illegal per se, or a condemned invasion of the person's right of privacy, for anyone openly and peaceably, at high noon, to walk up the steps and knock on the front door of any man's 'castle' with the honest intent of asking questions of the occupant thereof—whether the questioner be a pollster, a salesman, or an officer of the law." *Davis v. United States*, 327 F.2d 301, 303 (9th Cir. 1964). "Officers conducting a knock and talk also need not approach only a specific door if there are multiple doors accessible to the public." *United States v. Perea-Rey*, 680 F.3d 1179, 1188 (9th Cir. 2012). "An officer [initiating] a 'knock and talk' visit may approach any part of the building . . . where uninvited visitors could be expected." *Id.* (alterations in original).

And finally, that a suspect is the focus of a law enforcement inquiry when he is interviewed does not mean he is in custody for purposes of *Miranda*. *Beckwith v. United States*, 425 U.S. 341, 347 (1976).

Here, the officers' interview never approached a formal arrest or a restraint on Leiva-Leiva's freedom of movement to the degree associated with a formal arrest. The officers spoke to Leiva-Leiva by approaching him in front of his house and asking "Do you have a minute?" Exhibit 10 at 1. Leiva-Leiva asked whether they would like to speak with him inside, but they settled on talking outside in the shade. *Id.* This interview began casually; it is not a case in which law enforcement confronted, "ordered," or "instructed" the interviewee in a controlling way. *See, e.g.*, *United States v. Bassignani*, 575 F.3d 879, 884 (9th Cir. 2009); *see also United States v. Gregory*, 891 F.2d 732, 735 (9th Cir. 1989) (holding defendant not in custody even though officers drew their guns early in the encounter because afterward the defendant "consented to be interviewed in his house, he was interviewed in the presence of his wife, the interview lasted only a brief time, and no coercion or force was used");

OPPOSITION TO LEIVA-LEIVA'S
MOTION TO SUPPRESS STATEMENTS

9

*Beheler,* 463 U.S. at 1125 (holding that defendant was not in custody when he agreed to accompany police to the station to answer questions and was allowed to leave immediately afterward); *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (holding that defendant was not in custody when he came to the station voluntarily and left "without hindrance" after 30 minutes of questioning); *cf. Kim*, 292 F.3d at 974 (holding that target of a search warrant who was interviewed during a locked down search warrant of her business "did not willingly agree to submit to an encounter with the police.").

The physical surroundings of the conversation were non-threatening; the meeting occurred outside, in a place Leiva-Leiva was intimately familiar with. *Kim*, 292 F.3d at 977 (explaining that when interviewee is familiar with location, this factor weighs against him). Although there were three or four officers present, only two spoke with him, and none of the officers took control over the location. *See id.* No one blocked Leiva-Leiva's pathway back into his home or out to the street. No guns were unholstered. The defendant was never detained or handcuffed. *See United States v. Brobst*, 558 F.3d 982, 996 (9th Cir. 2009).

The duration of the meeting was short, less than 40 minutes. This timing weighs in favor of the interview being noncustodial. *Compare Gregory*, 891 F.2d at 735 (finding interviewee not in custody during brief interrogation that lasted a few minutes); *United States v. Norris*, 428 F.3d 907 (9th Cir. 2005) (interviewee not in custody during a 45-minute interrogation); *United States v. Crawford*, 372 F.3d 1048, 1052 (9th Cir. 2004) (non-custodial interview when defendant questioned for more than hour at FBI office); *and Bassignani*, 575 F.3d at 886 (interviewee not in custody while being interrogated for 2.5 hours); *with Kim*, 292 F.3d at 981 (holding accused was in custody during a 90-minute interrogation); *United States v. Wauneka*, 770 F.2d 1434, 1439 (9th Cir. 1985) (accused in custody during a 60-minute interrogation); *United States v. Beraun-Panez*, 812 F.2d 578, 579 (9th Cir. 1987) (finding accused in custody during an interrogation that lasted between 30 and 90 minutes).

The substance of the conversation also supports the non-custodial nature of the interview. The officers asked—and Leiva-Leiva answered—questions about his background (immigration, housing, and family). At times, the officers' questions implied that others had told them he associated with MS-13 gang members and that they believed he may have been an MS-13 gang member with ties to Mendota and El Salvador, but Leiva-Leiva consistently denied these associations. Reference was made to some

OPPOSITION TO LEIVA-LEIVA'S
MOTION TO SUPPRESS STATEMENTS

10

wire transfers that Leiva-Leiva had made, but he was not confronted with evidence of his guilt.  And "[t]he questioning officer did not 'adopt[ ] an aggressive, coercive, and deceptive tone,' as in cases in which this court has found interrogations to be custodial." *United States v. Martinez*, 602 F. App'x 658, 659 (9th Cir. 2015); *see also United States v. Barnes*, 713 F.3d 1200, 1204–05 (9th Cir. 2013) (finding custody when officers told suspect they had evidence of his offense and played tape recording of suspect engaging in incriminating phone call); *Beraun-Panez*, 812 F.2d at 579 (telling suspect that he was identified at the scene); *Wauneka*, 770 F.2d at 1439 (telling suspect that he matched description of rapist); *Brobst*, 558 F.3d at 995–96 (finding custody where defendant "was immediately confronted with evidence of the child pornography against him"). *Cf. Hayden*, 260 F.3d at 1067 (defendant was not confronted with evidence of guilt).

Finally, Leiva-Leiva exercised control over the situation by, for example, agreeing to a buccal swab but refusing to allow the officers to search his home.  He understood his right to refuse consent and exercised it when he wanted to do so.

In contending that this conversation was custodial, Leiva-Leiva relies on two inapposite cases involving interviews of target subjects that occurred during executions of search warrants.  A comparison between those cases (*Craighead* and *Kim*) and the facts in this case shows why his argument fails.  In *Craighead* there were eight officers present for a search warrant.  *Craighead*, 539 F.3d at 1078. All were armed, some wore protective gear, and some un-holstered their firearms in the defendant's presence.  *Id.*; *see id.* at 1085 ("[I]f the suspect sees the officers unholstering their weapons within his home, the suspect may reasonably believe that his home is no longer safe from the threat of police force").  The defendant was escorted to a small storage room in his home, and the door was closed behind him.  *Id.* at 1086.  One of the interviewing officers leaned with his back to the door, blocking the defendant's exit.  *Id.*  The defendant was also isolated from his superior Air Force officer, who was on scene.  *Id.*  In *Kim*, the defendant went to her store during the execution of a search warrant and found "the place surrounded by police cars."  292 F.3d at 974.  The police had the store locked up and unlocked it only to let her inside, then locked her inside, separating her from her husband who was left outside in the parking lot for three hours.  *Id.* at 971.  Once inside, the officers ordered the defendant on "what language she should speak and when and where she could sit."  *Id.* at 978.  And the officers'

OPPOSITION TO LEIVA-LEIVA'S
MOTION TO SUPPRESS STATEMENTS

11

questioning "covered in detail her pseudoephedrine sale activities—including her sources, her customers, and where she kept the proceeds." *Id.* at 977.

Those facts are not close to this case. Leiva-Leiva's home was not being searched. He spoke with officers for 40 minutes, outside, in front of his home. The officers did not draw their weapons, order him around, or confront him with evidence of his guilt. There was no pressure applied to him to participate in the questioning. The agents did not lock him inside or block his exit. The interview was casual and not coercive. Leiva-Leiva was not in custody, *Miranda* warnings were not required, and his motion to suppress his 2020 statements should be denied.

**B.    This Court should deny Leiva-Leiva's motion to suppress his 2023 interview statements.**

1.    The Pre-*Miranda* questions and answers fell under the "Booking Exception."

Leiva-Leiva argues that his answers to personal questions asked before the *Miranda* warning must be suppressed. Because those questions fall under the "booking exception," they were not subject to *Miranda*'s protections. Therefore Leiva-Leiva's answers should be admissible at trial.

When a suspect is in custody he must waive his *Miranda* rights before any interrogation. But courts have long held that routine booking questions do not amount to interrogation. *Pennsylvania v. Muniz*, 496 U.S. 582, 601 (1990) (plurality opinion) (referring to "questions to secure the biographical data necessary to complete booking or pretrial services."). "[T]he 'routine gathering of background biographical information, such as identity, age, and address, usually does not constitute interrogation.'" *United States v. Zapien*, 861 F.3d 971, 975 (9th Cir. 2017) (citation omitted). Because these types of booking questions "rarely elicit an incriminating response," they do not constitute interrogation "sufficient to trigger constitutional protections." *United States v. Gonzalez-Sandoval*, 894 F.2d 1043, 1046 (9th Cir. 1990). The Fifth Amendment therefore allows police officers to ask a suspect about his identity, age, and address without first giving *Miranda* warnings "even if identification of the person may help lead to the prosecution of that person for a crime." *United States v. Tryals*, 525 F. App'x 554, 556 (9th Cir. 2013). The ultimate test is an objective one: whether "the questions are reasonably likely to elicit an incriminating response in a particular situation." *United States v. Mata-Abundiz*, 717 F.2d 1277, 1280 (9th Cir. 1983).

OPPOSITION TO LEIVA-LEIVA'S
MOTION TO SUPPRESS STATEMENTS

12

In deciding whether questions fall under the "booking exception" courts review the questions and the context in which they are asked.  For example, questions are more likely to fall under the exception when they are "not related to the crime or the suspect's participation in it."  *United States v. Booth*, 669 F.2d 1231, 1238 (9th Cir. 1981); *Zapien*, 861 F.3d at 976 (emphasizing no evidence that agents made any "reference whatsoever to the offense for which [he] had been arrested").  Whereas questions "related directly to an element of a crime that [the officer] had reason to suspect" fall outside of the "booking exception."  *Mata-Abundiz*, 717 F.2d 1277.  The exception is more likely to apply when the questions are those regularly asked by an officer who handles booking or relays the answers to a booking agency, *see Zapien*, 861 F.3d at 976, and less likely to apply when the questions are asked by an agent or agency that ordinarily does not handling bookings, or when the questions are asked after a "true booking" has already occurred, *see United States v. Salgado*, 292 F.3d 1169, 1174 (9th Cir. 2002).  When personal questions are separated from investigatory questions, the personal ones are more likely to fall under the "booking exception."  *See United States v. Foster*, 227 F.3d 1096, 1103 (9th Cir. 2000).

At the beginning of the interview, Detectives Antunez and Iniguez started by asking Leiva-Leiva for his name, date of birth, age, telephone number, and address.  Government's Exhibit 8 at 1-3.  These are standard identity or biographical questions that courts have routinely found to fall within the "booking exception."  *See Zapien*, 861 F.3d at 975.  Relevant too, these questions were asked by employees of the very agency that operates the jail in which the defendant was being booked.  *See Zapien*, 861 F.3d at 976 (noting that booking exception is more likely to apply when the questions are those regularly asked by an officer who handles booking or relays the answers to a booking agency).  Leiva-Leiva makes no argument with respect to these questions, and the Court should therefore find that these answers are admissible against him.

After those initial questions, the next set of questions that the Sheriff's detectives asked were related to Leiva-Leiva's employment, who he lived with, and whether he had any children.  Government's Exhibit 8 at 3-7.  These questions were in no way "related to the crime" or Leiva-Leiva's "participation in it."  *Booth*, 669 F.2d at 1238; *Zapien*, 861 F.3d at 976.  Indeed, Leiva-Leiva makes no argument otherwise.  Instead, he contends that the officers learned substantial information in their follow

up questions on these topics.[5]  But he has not explained any theory for how those natural follow up questions—about the size or location of his employer's company or how Leiva-Leiva chose his son's name—elicited any incriminating responses, or were "reasonably likely to elicit an incriminating response." *Mata-Abundiz*, 717 F.2d at 1280.  Therefore, the Court should deny his motion to suppress these questions and answers too, as they fell under the "booking exception" and therefore did not amount to interrogation.  *See United States v. Gotchis*, 803 F.2d 74, 79 (2d Cir. 1986) (finding no error in admitting response to officer's question because "the information requested here—whether [defendant] was employed—falls within the benign category of basic identifying data required for booking and arraignment" (internal quotation marks omitted)); *United States v. Hernandez*, No. CR 11–00634–PHX–FJM, 2012 WL 161208, at *4 (D. Ariz. Jan. 19, 2012) (question and answer on defendant's employment admissible because it was "not related to an element of the crime" and "not reasonably likely to elicit an incriminating response"); *United States v. Knope*, 655 F.3d 647 (7th Cir. 2011) ("[R]evealing one's place of residence during booking, thereby identifying a place to search, [not] sufficient to invoke Miranda."); *but see United States v. Lin*, No. CR–01–20071 RMW (PVT), 2007 WL 405029, at *3 (N.D. Cal. Feb. 2, 2007) (granting motion to suppress defendant's response to booking question concerning his employment because it was asked "for investigative purposes").

That leaves only one series of questions and answers before *Miranda* warnings.  Det. Antunez indicated that he was going to turn to the investigation but first had to read "the Miranda warning." Government's Exhibit 8 at 7-8.  In an apparent effort to see whether Leiva-Leiva was familiar with *Miranda* warnings—Det. Antunez asked whether he had ever been arrested, which led to five questions and answers in which Leiva-Leiva indicated he had a prior encounter with law enforcement for driving without a license.  To the extent that Leiva-Leiva seeks to suppress this portion of the conversation, the Court need not rule on it because the government will not enter those five questions and answers into evidence during its case-in-chief at trial.[6]  After that aside, Det. Antunez read the *Miranda* warning.

Because the statements Leiva-Leiva made before being Mirandized were subject to the "booking

---

[5] Leiva-Leiva hyperbolically describes this portion of the conversation as "interrogat[ing], ECF 519 at 26:14-15; the interview recording shows the parties engaging in a conversational discussion about Leiva's biography.  Government's Exhibit 8 at 3-7; Government's Exhibit 6 at 7:50-13:13.

[6] The government can do so by, for example, clipping that portion of the interview out.

exception," the Court should deny the motion to suppress those statements.

2.    Leiva-Leiva knowingly, intelligently, and voluntarily waived his *Miranda* rights. Det. Antunez read each of the four *Miranda* warnings to Leiva-Leiva, *Miranda*, 384 U.S. at 479, and after each one, Leiva-Leiva affirmatively acknowledged that he understood the right, with an audible "Yes." Transcript at 9-10. Leiva-Leiva contends that his post-warning *Miranda* waiver was invalid. ECF 519 at 27:1.

The prosecution has the burden of proving by a preponderance of the evidence that a valid *Miranda* waiver occurred. *See United States v. Garibay*, 143 F.3d 534, 536 (9th Cir. 1998) (citing *Colorado v. Connelly*, 479 U.S. 157, 168 (1986)). The government must show that it was made knowingly, intelligently, and voluntarily. *See United States v. Binder*, 769 F.2d 595, 599 (9th Cir. 1985) (citing *Miranda*, 384 U.S. at 479). For knowingly and intelligently, the prosecution can show that the accused was aware of "the nature of the right being abandoned and the consequences of the decision to abandon it." *Garibay*, 143 F.3d at 536. For voluntariness, courts look to whether the government used such coercive activity that it undermined the suspect's ability to exercise his free will. *See Derrick v. Peterson*, 924 F.2d 813, 818 (9th Cir. 1990). "The validity of a waiver depends in each case upon the particular facts and circumstances surrounding [the] case, including the background, experience, and conduct of the accused." *Rodriguez v. McDonald*, 872 F.3d 908, 922 (9th Cir. 2017) (alteration in original).

When analyzing the totality of the circumstances, courts typically consider factors including: (i) the defendant's mental capacity; (ii) whether the defendant signed a written waiver; (iii) whether the defendant was advised in his native tongue or had a translator; (iv) whether the defendant appeared to understand his rights; (v) whether the defendant's rights were individually and repeatedly explained to him; and (vi) whether the defendant had prior experience with the criminal justice system. *United States v. Crews*, 502 F.3d 1130, 1140 (9th Cir. 2007).

Leiva-Leiva attacks the knowing and intelligent aspect of his *Miranda* waiver. He points to no piece of the warnings that were inaccurate but alludes to his having "expressed some confusion with respect to the warnings." ECF 519 at 27:5-6. This appears to be a reference to the brief discussion that he and Det. Antunez had about the right to remain silent.

A review of the interview shows that Leiva-Leiva validly waived his rights.  When Det. Antunez transitioned from the booking questions to the *Miranda* waiver, Leiva-Leiva leaned in and paid close attention.  Government's Exhibit 6 at 13:19-21.  Det. Antunez's tone and words indicated that the information he was about to convey was important and that he needed to make sure that Leiva-Leiva understood and clearly and unambiguously expressed his understanding.  *Id.*; Government's Exhibit 8 at 9-10.  That Leiva-Leiva understood the importance of this was again captured by the video, as he not only audibly confirmed his understanding but is seen nodding.  *Id.*; Government's Exhibit 6 at 13:30-33.  That Leiva-Leiva fully and intelligently understood the nature of his rights and what he was doing in waiving them is clear from the number of times he affirmed his understanding of the process.

Leiva-Leiva's knowing and intelligent waiver is also evidenced by his thoughtful and considered responses to the four *Miranda* warnings, including that he sought clarification during the reading of the first warning, the right to remain silent.  Det. Antunez repeated that warning twice for him.  Transcript at 9.  And before answering that he understood, Leiva-Leiva sought confirmation that he fully understood: "You are telling me that I have the right to—to remain quiet, right?" *Id.*  Det. Antunez confirmed: "Yes." *Id.*  Satisfied that he understood, Leiva-Leiva responded with "Okay." *Id.*  But Det. Antunez followed up to be sure:  "*So*, you understand?" *Id.*  And Leiva-Leiva affirmed: "Yes," followed by further confirmation, "I understand that." *Id.*  Rather than showing confusion on Leiva-Leiva's part, this portion of the interview shows that he was thoughtful and volitional in waiving his rights.

Det. Antunez then moved to the second, third and fourth warnings.  For each, Det. Antunez read the warning and received verbal confirmation that Leiva-Leiva understood the right. *Id.* at 9-10.

The transcript shows that Leiva-Leiva understood his rights and knew that he was waiving them.  He has made no showing that he was in any way coerced into proceeding with the interview.  Leiva-Leiva was over 40 years old at the time of the interview.  Government's Exhibit 8 at 1.  The *Miranda* warnings were read to him in Spanish, his native tongue.  And there is nothing in the record to indicate that he had a diminished mental capacity.

He references the fact that before he was read his *Miranda* warning he was arrested in another city and transported in handcuffs to the Sheriff's office in Fresno.  But he identifies no evidence of coercive techniques or circumstances before or during the reading of the *Miranda* warnings.  The use of

handcuffs during a transport is a "basic police procedure" that has "never been held to constitute sufficient coercion to warrant suppression." *United States v. Cardenas*, 410 F.3d 287, 295 (5th Cir. 2005). Moreover, even if there were some evidence that the transportation had some effect on his mental state, a suspect need not be in an ideal frame of mind for his *Miranda* waiver to be voluntary. *See, e.g.*, *United States v. George,* 987 F.2d 1428, 1430–31 (9th Cir. 1993) (*Miranda* waiver held voluntary even though suspect was "undoubtedly in critical condition," in hospital, on medication, and in pain).

Given the clarity of the transcript, and without evidence to the contrary, this Court should find that Leiva-Leiva knowingly, intelligently, and voluntarily waived his *Miranda* rights.

3.    Leiva-Leiva voluntarily made his statements during the 2023 interview.

A confession is voluntary if it is "the product of a rational intellect and a free will." *Blackburn v. Alabama*, 361 U.S. 199, 208 (1960). Courts assess voluntariness under the totality of the circumstances, considering both the suspect's characteristics and the details of the interrogation. *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973). Relevant factors include the length of detention, the use of psychological ploys, and deprivation of basic needs. *Id.* The touchstone is whether law enforcement's conduct overbore the defendant's will. *Doody v. Schriro*, 596 F.3d 620, 638 (9th Cir. 2010) (en banc) (internal quotations and citations omitted).

That standard is demanding—and it is not met here.

At the outset, the procedural safeguards cut strongly against any claim of coercion. Leiva-Leiva was advised of his *Miranda* rights and agreed to speak. *See United States v. Williams*, 435 F.3d 1148, 1151–52 (9th Cir. 2006) (emphasizing that a proper *Miranda* warning undercuts a claim of coercion). Midway through the interview, officers went further: they read him a *Corley* waiver and presented him with a written copy in Spanish, which he signed. That warning again advised him of his right to remain silent as well as his right to a lawyer. Government's Exhibit 8 at 49. That additional, written acknowledgment—given after time in custody and during a break in questioning—confirms that his decision to continue speaking was considered, not compelled. It is powerful contemporaneous evidence that his statements were the product of choice.

OPPOSITION TO LEIVA-LEIVA'S
MOTION TO SUPPRESS STATEMENTS

17

a. Leiva-Leiva's selective admissions confirm a functioning, not overborne, will.

The best evidence of voluntariness is how the suspect responds. Leiva-Leiva did not confess. He resisted. The record makes clear that his statements were not extracted by insistent badgering, or physical force, or psychological coercion. Throughout the interview, he denied core allegations and made only narrow, calculated admissions—acknowledging discrete facts while minimizing culpability. When he conceded, he did so carefully and strategically: acknowledging his voice on a recording and minimizing his associations with MS-13 gang members. These were not capitulations; they were tactical concessions. That pattern is incompatible with coercion.

And that matters. The Ninth Circuit treats such selective admissions as evidence of voluntariness because they reflect "a product of [the defendant's] own balancing of competing considerations." *United States v. Miller*, 984 F.2d 1028, 1031 (9th Cir. 1993); *United States v. Ramos*, 65 F.4th 427, 436 (9th Cir. 2023) (affirming voluntariness where agents did not overbear defendant's will). Leiva-Leiva was not overborne—he negotiated. A suspect who chooses what to admit has not had his will overcome; he is exercising it. That Leiva-Leiva parried the agents' questions and selectively chose which details to admit, shows that his statements were the result of a "rational intellect" rather than a crushed will. *Blackburn*, 361 U.S. at 208.

b. Leiva-Leiva's conditions of confinement fall well within constitutional limits.

Leiva-Leiva's conditions-of-confinement theory fails because his circumstances were routine—and far removed from the cases finding coercion.

The length of Leiva-Leiva's interview did not render it involuntary. He was questioned in parts for just over two hours, with three breaks in between that questioning. One of those breaks was about 18 minutes, another was close to ten minutes, and the final break was well over an hour. The day was a long one because of his arrest, transportation, and questioning. But the interrogation period was not extraordinary. Confessions after longer interrogations have been held to be voluntary. *See United States v. Haswood*, 350 F.3d 1024, 1027–29 (9th Cir. 2003); *Cunningham v. Perez,* 345 F.3d 802, 810–11 (9th Cir. 2003) (officer did not undermine interviewee's free will where interrogation lasted for eight hours and officer did not refuse to give break for food and water). By contrast, courts generally reserve

OPPOSITION TO LEIVA-LEIVA'S
MOTION TO SUPPRESS STATEMENTS

18

findings of coercion for extreme durations. *See Ashcraft v. Tennessee*, 322 U.S. 143, 149–54 (1944) (36 hours of continuous interrogation). Even isolation in a police car for four hours does not render a statement involuntary. *Derrick*, 924 F.2d at 819. Measured against precedent, this interview length was unexceptional.

Leiva-Leiva's handcuffing during transport did not render his statement involuntary. There is no evidence in the record that Leiva-Leiva complained of any discomfort from his handcuffed transportation or that he sought any adjustment of the handcuffs that was denied to him. As referenced already above, the use of handcuffs during a transport is a "basic police procedure" that has "never been held to constitute sufficient coercion to warrant suppression." *Cardenas*, 410 F.3d at 295. The Ninth Circuit has observed that if transporting a handcuffed suspect were coercive, "virtually every arrest" would be unconstitutional. *United States v. Orso*, 266 F.3d 1030, 1039–40 (9th Cir. 2001), *abrogated on other grounds by Missouri v. Seibert*, 542 U.S. 600, 124 S. Ct. 2601, 159 L. Ed. 2d 643 (2004). Significantly too, during the hours that Leiva-Leiva was inside the interview room, he was uncuffed.

In terms of food, water, and rest, the record shows attentiveness, not deprivation. Officers provided him with water and repeatedly offered more. Government's Exhibit 8 at 47, 81. Leiva-Leiva declined additional amounts and expressed that he was fine. *Id.* The officers later offered food—before he even asked—and he accepted. *Id.* at 81–82. He was also invited to lie down and rest, which he did. *Id.* Leiva-Leiva repeatedly thanked the officers for their attentiveness and for the provisions they gave him. *Id.* at 47, 90. He points to no similar case finding coercion. Nor could he. *See, e.g.*, *Amaya-Ruiz v. Stewart*, 121 F.3d at 494 (upholding voluntariness despite overnight detention with no sleep, defendant left with only a blanket and underwear, and no provision of food or drink).

Though Leiva-Leiva urinated in a bottle, he never asked to use a restroom. He had been provided with an opportunity to use the restroom during transport. Government's Exhibits 4 and 5. And he does not allege that he was either denied the opportunity to use the bathroom or led to believe that he would have been denied if he had asked. Indeed, when officers realized he was urinating in a bottle, they entered the room and immediately told him he could simply knock and ask for a bathroom break. Government's Exhibit 8 at 90-91. Thus, there is no evidence of deprivation—only a misunderstanding, promptly corrected.

OPPOSITION TO LEIVA-LEIVA'S
MOTION TO SUPPRESS STATEMENTS

19

Taken together, these circumstances reflect a controlled but ordinary custodial interview—not coercion.

c.    Special Agent Demmon's tactics were not psychologically overbearing.

In contending his statements were involuntary, Leiva-Leiva focuses on the final phase of the interview, when Special Agent Demmon entered, slid the the table aside with his foot, sat close, and used blunt language ("You know you're screwed, right?").  Those tactics were forceful, not unlawful.

A confession is involuntary only if "coerced either by physical intimidation or psychological pressure." *Haswood*, 350 F.3d at 1027.  The bar for psychological coercion is high.  For example, the Ninth Circuit found it met in *United States v. Tingle*, 658 F.2d 1332 (9th Cir. 1981), when an agent caused a defendant to breakdown into tears for several minutes and confess after the agent "deliberately prey[ed] upon the [defendant's] maternal instinct and inculcate[d] fear in a mother that she will not see her child." *Id.* at 1336.  Confrontation—even aggressive confrontation—is generally permissible. *Haswood*, 350 F.3d at 1027.  For example, in *United States v. Haswood*, the Ninth Circuit reversed a district court's suppression of a defendant's statement.  There, the defendant confessed only after an FBI agent administered a polygraph examination, then showed a newspaper article to the defendant about a similar case in which the target had lied to the FBI agent and was ultimately sentenced for both the underlying offense and for having made false statements. *Id.* at 1026.  The Ninth Circuit reversed the district court's finding of involuntariness. *Id.* at 1029.  The court concluded that, even if it accepted the district court's underlying findings and inferences, the record still lacked any evidence of coercion. *Id.* Law enforcement officers may confront suspects with evidence, appeal to defendants' emotions, and even provide false or misleading information. *See, e.g., Frazier v. Cupp*, 394 U.S. 731, 737–39 (1969); *Ortiz v. Uribe*, 671 F.3d 863, 870–72 (9th Cir. 2011); *United States v. Moreno-Flores*, 33 F.3d 1164, 1168-70 (9th Cir. 1994).

Demmon's conduct—moving furniture, sitting close, accusing Leiva-Leiva of lying, and emphasizing the consequences—falls within permissible bounds.  He challenged Leiva-Leiva's story and emphasized the strength of the evidence. *See United States v. Bautista-Avila*, 6 F.3d 1360, 1364 (9th Cir. 1993); *Amaya-Ruiz*, 121 F.3d at 494 (considering whether the officers' statements were "sufficiently compelling to overbear [defendant's] will").  But he did not threaten harm.  And he did not

OPPOSITION TO LEIVA-LEIVA'S
MOTION TO SUPPRESS STATEMENTS

20

make any unlawful promises or coercive appeals to emotion.  Ultimately, the videotape of the interview is the best evidence that the Defendant's free will was not overborne.  *See Ramirez-Marentes v. Ryan*, 2010 WL 2902524, at \*15 (C.D. Cal. June 18, 2010), aff'd, 580 F. App'x 601 (9th Cir. 2014).  Most tellingly, Demmon's tactics did not produce a confession.  Leiva-Leiva continued to deny wrongdoing.  That response confirms what the law requires: his will remained intact.

              d.      Leiva-Leiva lacked the vulnerabilities that typically support coercion claims.

Courts are concerned when defendants are unusually susceptible—juveniles, the intellectually disabled, or those exploited for known weaknesses.  *See Taylor v. Maddox*, 366 F.3d 992, 1015 (9th Cir. 2004) (juvenile); *United States v. Preston*, 751 F.3d 1008, 1020 (9th Cir. 2014) (intellectual disability).  Leiva-Leiva fits none of those categories.  He is an adult, with no evidence of cognitive impairment, who was interviewed in his native language, and who understood his rights and exercised them selectively.  Without vulnerability, ordinary police pressure does not become unconstitutional.  *See, e.g.*, *United States v. Crespo de Llano*, 838 F.2d 1006, 1016 (9th Cir. 1987) (rejecting defendant's involuntariness argument that her statement was coerced because she was a 21–year-old housewife, without formal education or experience with the criminal justice system).

              e.      Failure to notify the Defendant of his consular rights is not a basis for suppression.

The Defendant suggests the failure to notify him of his rights under the Vienna Convention supports a finding of involuntariness.  But the Supreme Court has held that is is "unnecessary to apply the exclusionary rule where other constitutional and statutory protections—many of them already enforced by the exclusionary rule—safeguard the same interests."  *Sanchez-Llamas v. Oregon*, 548 U.S. 331, 350 (2006).  And the Ninth Circuit has implicitly rejected the idea that a lack of consular notification renders a confession involuntary.  *United States v. Lombera–Camorlinga*, 206 F.3d 882, 886 (9th Cir. 2000) (en banc).  Thus, like the rest, this argument fails.

\* \* \*

Leiva-Leiva was advised of his rights, validly waived them, and then exercised judgment throughout the interview—denying, deflecting, and selectively conceding.  The conditions of confinement were ordinary.  Most of the interview was conversational.  Special Agent Demmon's tactics

OPPOSITION TO LEIVA-LEIVA'S
MOTION TO SUPPRESS STATEMENTS

21

were firm but lawful.  And nothing in the record resembles the extreme circumstances required to overbear a suspect's will.

Because Leiva-Leiva's statements were voluntary, his motion to suppress should be denied.

## IV.   CONCLUSION

The 2020 conversation in Leiva-Leiva's front yard was consensual.  The 2023 booking questions and answers were administrative.  Leiva-Leiva's statements in the post-*Miranda* portion of the 2023 interview were voluntary.  His motion to suppress his statements should be denied.

Dated:  April 14, 2026                                ERIC GRANT
                                                      United States Attorney


                                            By:  /s/ JUSTIN J. GILIO
                                                 JUSTIN J. GILIO
                                                 ROBERT L. VENEMAN-HUGHES
                                                 Assistant United States Attorneys

OPPOSITION TO LEIVA-LEIVA'S                22
MOTION TO SUPPRESS STATEMENTS